UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MALLCO COMPANY, a Michigan
co-partnership,

   Plaintiff,

         Case No. 2:16-cv-10010

v.

         Hon. Denise Page Hood

UNIVERSAL GRANITE & MARBLE,
INC., an Illinois corporation,

   Defendant.

_____/

| | |
|---|---|
| Keith C. Jablonski (P62111) | Eric D. Scheible (P54174) |
| Eric C. Turnbull (P76382) | Tracey L. Porter (P69984) |
| O'REILLY RANCILIO P.C. | FRASCO CAPONIGRO |
| Attorneys for Plaintiff | WINEMAN & SCHEIBLE, PLLC |
| 12900 Hall Road, Suite 350 | Attorneys for Defendant |
| Sterling Heights, MI 48313 | 1301 W. Long Lake Road, Suite 250 |
| (586) 726-1000 / (586) 726-1560 (fax) | Troy, MI 48098 |
| kjablonski@orlaw.com | (248) 334-6767 / (248) 334-0999 (fax) |
| eturnbull@orlaw.com | es@frascap.com |
| | tp@frascap.com |

_____/

**DEFENDANT'S PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW**

  Defendant Universal Granite & Marble, Inc. ("UGM") through its attorneys,

Frasco Caponigro Wineman & Scheible, PLLC, states for its Proposed Findings of

Fact and Conclusions of Law as follows:

## A.  PREAMBLE[1]

Plaintiff Mallco Company ("Plaintiff") improperly attempted to paint a picture for this Court that Defendant used and abused the commercial building located at 31201 Mally Drive, Madison Heights, Michigan 48071 ("Premises") during its fourteen (14) year tenancy.  Plaintiff claims that the building, overhead cranes, and parking lot were in such poor condition that Plaintiff incurred in excess of $100,000 in expenses just repairing the damage that was purportedly caused by Defendant.

However, the picture Defendant attempted to paint did not comport with the evidence adduced at trial.  Plaintiff, after finding a new tenant to lease the Premises, was required to make improvements for the new tenant and / or bring the building up to code but wants to hold Defendant responsible for these improvements.  The fact that Plaintiff waited *more than a year* after the Defendant vacated the Premises to even begin making improvements is damning to its case.  Moreover, the Premises sat vacant for almost a year and a half before a new tenant arrived, contributing, or in many instances, causing or exacerbating the damage that necessitated the repairs Plaintiff claims needed to be done.

The simple and undeniable fact is, no matter what Plaintiff's motivation was to attempt to recover over $100,000 against Defendant, Plaintiff has absolutely

---

[1] In lieu of providing closing statements at the close of the trial, the Court allowed the parties to include a preamble / statement in their respective Proposed Findings of Fact and Conclusions of Law.

zero evidence that Defendant caused the damage that purportedly compelled Plaintiff to make the repairs to the Premises. Accordingly, this Court should enter a judgment of no cause of action on Plaintiff's Complaint and award Defendant all other relief this Court deems equitable and just.

## B. PROPOSED FINDINGS OF FACT

1. Plaintiff is a Michigan co-partnership that owns the real property at 31201 Mally Drive, Madison Heights, Michigan 48071 ("Premises").

2. Chester Lane Mally ("Mr. Mally") is the general partner of Plaintiff and is the only partner who runs Plaintiff's day-to-day operations. The remaining partners are silent partners. Plaintiff does not have any employees.

3. Mr. Mally has fifty (50) plus years of experience in real estate, with a focus on leasing and selling real estate.

4. The Premises is an industrial, high crane building that was built in the 1960s. The Premises is approximately 18,000 square feet.

5. The Premises has a large warehouse (or shop) area and a smaller office area. The Premises has three (3) bathrooms; one bathroom in the shop and two (2) bathrooms in the office.

6. There are two 10-ton overhead cranes on the Premises (collectively, "Cranes") that were installed by the Plaintiff just prior to when Defendant leased the Premises in 2002.

7. The Cranes were in a used condition but the exact age of the Cranes when installed in 2002 is unknown.

8. Plaintiff does not have any paperwork that indicates the history of the Cranes or the age of the Cranes.

9. Defendant is a company that buys and sells heavy stone from all over the world and sells full slabs of the stone to customers. Defendant does not fabricate the stone at its facilities. Defendant has six operating locations. The

Premises was the first location Defendant opened in Michigan. Defendant used the Premises as its receiving, distribution, and sales office during its tenancy.

10. Defendant sought to expand its operations in Michigan in 2001. In order to expand its operations, Defendant, through its representative, Sheldon Paul, conducted market research and ultimately determined that the best location in Michigan for Defendant would be somewhere along the I-75 corridor. Defendant also needed a specific building for its operations. For example, the building needed to have large, overhead cranes as well as large garage doors in a cross pattern. Defendant looked at more than 100 buildings and the only building that fit its needs was the Premises.

11. Plaintiff was aware that Defendant was going to use the Premises for its receiving, distribution, and sales office and that Defendant bought and sold heavy stone. Plaintiff approved Defendant's use of the Premises for these purposes.

12. During the lease negotiations, Defendant asked Plaintiff to make repairs to the parking lot and to the building. Plaintiff never responded to these requests.

13. On March 26, 2003, Plaintiff and Defendant entered into a written Amended and Restated Office Lease ("Lease") whereby Defendant leased the Premises from Plaintiff for a period of five years and three months beginning on November 4, 2002 and ending on February 4, 2008 (Exhibit 1).

14. The Lease was drafted by Plaintiff. Plaintiff does not know why the Lease is entitled "Amended and Restated" when it was the first Lease between the parties (Exhibit 1).

15. Defendant took possession of the Premises on November 2, 2002 (Exhibit 1, Introduction, p. 1).

16. When describing the condition of the Premises and parking lot prior to Defendant's tenancy, Mr. Mally continually used the term "serviceable," which he defined as meaning "not new."

17. There are no photos of the Premises that were taken on or around November 2, 2002 by either party to show the condition of the Premises, the condition of the parking lot, or the condition of the Cranes.

18.    The parking lot was in need of repairs when Defendant took possession because it was not in good condition; however, Plaintiff did not make any repairs prior to Defendant's tenancy.

19.    Defendant wanted to put yellow lines on the parking lot to denote parking spaces shortly after it occupied the Premises; however, it was unable to do so because the parking lot was not in a good enough condition that would allow the lines to be painted.

20.    Defendant remodeled the office space portion of the Premises, adding a show room for its operations. During that remodel, Defendant added stone, lighting and remodeled both bathrooms in the office area. Defendant spent approximately $50,000 on the remodel / build out.

21.    Plaintiff approved Defendant's build out of the office area.

22.    Defendant did not make any improvements on the warehouse side of the Premises during the build out.

23.    The Lease was extended on multiple occasions via writings signed by both parties (Exhibits 2 – 6).

24.    Before the most recent extension, Plaintiff offered Defendant's representative, Sheldon Paul, a three-year extension of the Lease. Defendant rejected that offer and opted for a one year extension instead.

25.    The most recent written extension to the Lease extended the term of the Lease for one year from April 3, 2014, through April 3, 2015, and increased the monthly rent to $8,616.69 (Exhibit 6).

26.    Sheldon Paul, Defendant's representative, handwrote on the most recent written extension (Exhibit 6) "… as is required in the original Lease."

27.    Paragraph 13 of the Lease provides, in relevant part:

(13) REPAIRS-TENANT   Except as otherwise provided in this Lease, **Tenant shall at its expense maintain the premises and each component** thereof and all of Tenant's property upon the premises **in a <u>good and clean operating condition</u>. Tenant's obligation shall**

**consist of maintenance and repair of (a) parking and landscaping and the exterior of the Leased premises including replacement of broken glass, (b) the interior portions and components of the Leased premises such as the walls, ceiling, windows, heating, air conditioning, electrical, plumbing, sprinkler and security systems**. . . . **Tenant shall have no obligation to make** any structural modifications, reconstruction and/or replacement of any portion of the Lease premises including specifically the roof, foundation, exterior walls and replacement of **major repair** to a component of the heating or air conditioning system and the **cranes** (referred to in paragraph 54 herein) **or components thereof** and Landlord shall bear sole responsibility for any structural modifications, reconstruction and/or replacement **unless the damage giving rise to such modifications, reconstruction and/or replacement is caused by Tenant**. Notwithstanding anything in this Lease to the contrary, Tenant's responsibility with respect to the heating and air conditioning system will be limited to ordinary repair, preventative maintenance and maintenance of said systems.

(Exhibit 1, emphasis added).

28. Paragraph 20 of the Lease provides:

(20) CONDITION OF PREMISES AT TIME OF LEASE. **The Tenant further acknowledges that it has examined the said Leased premises prior to the making of this Lease and knows the condition thereof** and that no representations as to the condition or state or repairs thereof have been made by the Landlord or his agent which are not herein expressed **and the Tenant hereby accept the Leased premises in their present condition at the date of the execution of this Lease. To the best of Landlord's knowledge there are no observable or latent defects with respect to the premises.**

(Exhibit 1, emphasis added).

29. Paragraph 54 of the Lease provides, in relevant part:

(54) CRANES . . . **Tenant shall be responsible for routine inspections and maintaining the cranes in good operating order**

**and applicable OSHA standards**, Tenant shall hold Landlord harmless from any claims arising from Tenant's use and operation of them. **Landlord will be responsible for replacement and major repair to the overhead cranes so long as such replacement is not due to Tenant's misuse of the cranes** such as loading them in excess of their capacities or its failure to maintain the cranes in operating order and in accordance with applicable OSHA standards.

(Exhibit 1, emphasis added).

30.     Defendant continued to occupy the Premises after April 3, 2015, on a month-to-month basis, as agreed upon between Plaintiff and Defendant.

31.     During its tenancy, Defendant received shipments of the stone on large trucks, which drove on the parking lot.  However, the trucks were equipped with air brakes, as Mr. Gulati testified, which redistribute the weight of the truck and lessen the weight that the truck places on the surface (here, the parking lot).

32.     Defendant estimates that it received shipments to the Premises four to five times on a weekly basis, but was unable to estimate, with any degree of accuracy, how many deliveries Defendant made (i.e. stone leaving the Premises).

33.     During its tenancy, Defendant replaced one of the two overhead doors (the front one) located in the warehouse.

34.     During its tenancy, Defendant had the HVAC system repaired and maintained at least once a season (i.e. winter / summer), including replacing the filters.

35.     At one time during its tenancy, Defendant received an estimate from an HVAC repair company to replace the entire HVAC system due to its age.  Defendant provided that invoice to Plaintiff and requested that the HVAC system be replaced.  Plaintiff denied Defendant's request to replace the HVAC system.

36.     During its tenancy, Defendant had the exterior of the Premises painted a couple of times.

37.     During its tenancy, Defendant installed a new water heater on the Premises.

38.     When Defendant first occupied the Premises, the warehouse bathroom was old.  During its tenancy, Defendant's employees rarely used the warehouse bathroom because it was old instead opting to use the remodeled restroom in the office.

39.     During its tenancy, Defendant had the Cranes repaired numerous times, paying at least $66,086.32 to repair the Cranes, as summarized and reflected in Exhibit 114.

40.     Defendant also repaired the Cranes additional times that are not reflected in the exhibits or on Exhibit 114.  For example, Defendant used additional companies not reflected in Exhibit 114, such as National Crane.

41.     During its tenancy, Defendant requested that Plaintiff pay for repairs to the Cranes.  Plaintiff remembered paying for one repair in the amount of $8,000 and believes that it paid for additional repair; however, Plaintiff does not recall the amount of the repair or when it occurred.

42.     Defendant requested Plaintiff pay for repairs to the Cranes additional times, but Plaintiff refused to pay to repair the Cranes other than one or two times.

43.     One of the repairs that Defendant made to the Cranes was to replace the trolley and hoist on the south Crane because the load brake assembly and gearing was unsafe for continued use (Exhibit 104).  Defendant spent a total of $18,535 to make this repair (Exhibits 104, 105). When replacing the trolley and hoist, Defendant elected to install a 5-ton crane hoist instead of the 10-ton crane hoist that was previously there because Defendant did not need a weight capacity greater than 5 tons.

44.     Although Mr. Mally initially testified that he was unaware that Defendant replaced the trolley and hoist on the south Crane reducing it from a weight capacity of 10 tons to 5 tons until trial, he later admitted that it was possible that Defendant requested that Plaintiff replace the trolley and hoist and that Plaintiff declined to do so.

45.     During its tenancy, Plaintiff only briefly observed Defendant's employees operating the Cranes and Plaintiff never witnessed Defendant's employees operating the Cranes for any extended period of time.

46.     Defendant's employees who operated the Cranes were provided with a one-day training session on how to properly operate the Cranes.

47.     Defendant had the Cranes inspected (Exhibit 48).

48.     OHSA inspected the Cranes at least a few times during Defendant's tenancy and OHSA never issued any fines to Defendant as a result of those inspections.

49.     At the time Defendant vacated the Premises, the Cranes were operational.

50.     Approximately three (3) months after Defendant vacated the Premises, Steve Lariviere from Terex Services evaluated the Cranes at Plaintiff's request.  Mr. Lariviere completed a Service Report for both Cranes (Exhibit 115).

51.     Steve Lariviere did not witness Defendant operating the Cranes and could not say with certainty the reason the Cranes needed the service that he recommended in his Service Report (Exhibit 115).

52.     It was impossible for the Defendant to load the Cranes in excess of their weight capacity (10 ton / 5 ton) due to weight of the individual slabs, as well as the weight of each bundle of slabs.

53.     Plaintiff has no evidence that Defendant misused the Cranes during its tenancy.

54.     During its tenancy, Defendant paid to have patchwork completed on the parking lot on two occasions and also paid to have a new layer of asphalt placed on the entire parking lot.

55.     During Defendant's tenancy, Plaintiff never paid to have any repairs made to the parking lot.

56.     Defendant vacated the Premises in July, 2015.  After Defendant vacated the Premises, it no longer had any obligations under the Lease to maintain the Premises.

57.     The Premises was in the same or better condition at the time Defendant vacated than when it first occupied the Premises in November, 2002.

58.     The parking lot was in slightly worse condition when Defendant vacated than when it first occupied the Premises in November, 2002 due to normal wear and tear.  Defendant believes that $10,000 would be needed to put the parking lot back in the same condition as it was when Defendant first occupied the Premises in November 2002.

59.     There are no photographs, other than the photographs of the parking lot offered by Plaintiff (Exhibit 11), that demonstrate the condition of the Premises when Defendant vacated in July, 2015.  The photographs in Exhibit 11 are undated and Mr. Mally was unable to say with certainty when the photographs of the parking lot were taken.

60.     Upon vacating, Defendant left the Premises in a broom-clean condition.

61.     Upon vacating, Plaintiff did not request that Defendant remove any fixtures.

62.     Defendant only removed its personal property when it vacated the Premises.  Defendant did not remove any fixtures or any of Plaintiff's property when it vacated the Premises.

63.     Defendant did not pay rent in July, 2015; however, Plaintiff is in possession of Defendant's security deposit in the amount of $8,816.67, which was the amount of the monthly rental rate in July, 2015.

64.     After Defendant vacated the Premises, it paid Lawrence Bird to repair a catch basin in the parking lot of the Premises (Exhibit 36; Exhibit 98).  Lawrence Bird rebuilt the catch basin with brick and installed a new cover and new concrete apron around the catch basin (Exhibit 98); he also "excavated the collapsed sewer outlet eight feet filled with dirt" (Exhibit 98).  Defendant paid $4,400 to Lawrence Bird for repair to the catch basin at the Premises.

65.     The Premises remained vacant for nearly a year and a half, from July, 2015 through January, 2017.

66.     The new tenant at the Premises is Superior Cam.  Plaintiff identified Superior Cam as the new tenant in May or June of 2016 and Superior Cam moved into the Premises in January, 2017.

67.     It was not until a new tenant was identified that Plaintiff commenced repairs and/or work on the Premises.

68.     On or about July 5, 2016, Plaintiff retained Dave Garbo ("Garbo") of National Construction Mgmt., Inc. to coordinate with contractors hired by Plaintiff. Garbo charged Plaintiff $85.00 per hour for his time.

69.     The first time Garbo was at the Premises was in June of 2016. Prior to June, 2016, Garbo was never at the Premises and did not know the condition of the Premises.

70.     Garbo was unaware of any of the repairs that Defendant made to the Premises during its tenancy; Garbo was also unaware of any repairs that Plaintiff made to the Premises prior to June, 2016.

71.     Garbo did not review the terms of the Lease to make a determination as to what liability, if any, Defendant had for the repairs that he was hired to coordinate.

72.     Garbo also was retained by Superior Cam and acted as a dual agent for Plaintiff and Superior Cam.

73.     Garbo issued six (6) invoices to Plaintiff and Plaintiff seeks to recover a total of $7,266 from Defendant for the services that Garbo provided (Exhibits 25, 113). Garbo's services included coordination of the repairs with contractors and supervising the repairs at the Premises. Garbo spent a total of 84.5 hours providing services to Plaintiff.

74.     Garbo testified that he met with both Superior Cam and Plaintiff at the same time to discuss Superior Cam's tenancy at the Premises and Garbo included that time on the invoices issued to Plaintiff.

75.     Garbo did not make a determination as to what portion of the invoices (Exhibits 12 through 25) was the responsibility of Defendant; it was Mr. Mally who made that determination.

76.     Mr. Mally testified that he relied on Garbo to make the determination as to what portions of the invoices (Exhibits 12 through 25) should be passed on to Defendant.

77.     Plaintiff seeks to recover a total of $118,600.18 from Defendant for repairs Plaintiff made to the Premises *after* Defendant vacated (Exhibit 113).[2]

78.     Defendant denies that it is responsible for the amount Plaintiff seeks because many of the repairs were made to comply with the updated building code and updated fire code, were needed as a result of damage caused by prior tenants, were needed to fix damage that was caused while the Premises was vacant for a year and a half after Defendant vacated, and were repairs made at the request of Superior Cam.

79.     Plaintiff seeks to recover from Defendant $4,400 for services that Donald R. Kellett Co ("Kellett") performed on or about August 31, 2016 – more than a year after Defendant vacated the Premises (Exhibit 12, Invoice 47220; Exhibit 113).  Plaintiff described the work as "due diligence" done on the catch basins and discharge lines to determine what work was necessary.  Plaintiff did not conduct this "due diligence" before Defendant took possession of the Premises in November, 2002.  Plaintiff did not know when the discharge lines were filled with plastic and broken asphalt or debris.  Plaintiff did not know when the discharge lines were broken and separated as alleged.

80.     Plaintiff seeks to recover from Defendant $9,065 of the $9,970 it paid to Kellett for services that Kellett performed on or about October 25, 2016 – more than a year after Defendant vacated the Premises (Exhibit 12, Invoice 47456; Exhibit 113). Neither Plaintiff nor Garbo knew how the allocation of $9,065 was made or why that amount is being sought from Defendant.  There is an entry on Invoice 47456 that states: "Remainder Due on Contract: $9,065.00" (Exhibit 12, Invoice 47456).   Neither Plaintiff nor Garbo recalled what services Kellett performed for the $9,065 amount.  There are no details included on the Invoice or in Exhibit 12 that relate to the $9,065 – such information would have been included on the Quotation, which was not marked as an exhibit or introduced at trial.

81.     Plaintiff seeks to recover from Defendant $1,060 of the $1,735 it paid to Kellett for services that Kellett performed on or about August 31, 2016 – more than a year after Defendant vacated the Premises (Exhibit 12, Invoice 47365;

---

[2] The amount of $118,600.18 takes into account the tax credit in the amount of $2,432.29 that Plaintiff owes Defendant.  The figure that appears on page two of Exhibit 113 did not take into account the tax credit ($121,232.45 - $2,432.29 = $118,600.18).

Exhibit 113). Neither Plaintiff nor Garbo knew how the allocation was determined. The $1,060 amount Plaintiff seeks to recover from Defendant includes at least a portion of the $1,500 Plaintiff paid for rough plumbing (Exhibit 12).

82.     On January 16, 2017, approximately a year and a half after Defendant vacated the Premises, Mechanical Heating & Cooling serviced the HVAC system at the Premises at the request of Plaintiff (Exhibit 13). Mechanical Heating & Cooling charged $275.00 for a "maintenance agreement," which Plaintiff believes was the fee for the service call and tune up that was performed, and an additional $60.00 for four (4) filters (Exhibit 13). Even though the Premises remained vacant for a year and a half, Plaintiff seeks to recover the total amount charged by Mechanical Heating & Cooling (i.e. $335.00) from Defendant (Exhibit 113). Plaintiff could have serviced the HVAC system immediately after Defendant vacated the Premises in July, 2015, but chose not to do so. In either event, this cost was incurred as maintenance after the Lease termination and is not Defendant's expense.

83.     On December 15, 2016, approximately a year and a half after Defendant vacated the Premises, at Plaintiff's request, CNS Electric Co. ("CNS") made electrical repairs to the Premises (Exhibit 14). Plaintiff seeks to recover from Defendant $1,330 for the repairs reflected in page 1 of Exhibit 14 (Exhibit 14, p. 1; Exhibit 113). Plaintiff does not have any evidence that Defendant was the reason these repairs were required and it is possible that the repairs were needed because the Premises sat vacant for more than a year.

84.     Plaintiff also seeks to recover $12,291.45 from Defendant for additional electrical repairs that CNS performed on the Premises on or about August 30, 2016 (Exhibit 14, Invoice No. 4213; Exhibit 113). Plaintiff does not know which portions of Invoice No. 4213 it is seeking to recover from Defendant. Garbo was also unable to articulate which portions of Invoice 4213 Plaintiff sought to recover from Defendant and Mr. Mally relied on Garbo for this breakdown.

85.     Plaintiff admitted the $11,990 that Plaintiff does not seek to recover from Defendant related to the CNS Invoice (Exhibit 14, Invoice 4213), is related to repairs that CNS made that were caused by a prior tenant.

86.     Plaintiff seeks to recover $6,000 from Defendant for work that was performed by Shelby Underground, Inc. on or about September 14, 2016, to the catch basins in the parking lot and the leads to the main sewer (Exhibits 15, 113).

This work was performed after the Premises sat vacant for nearly a year and a half. Plaintiff has no evidence that the repairs were necessitated by Defendant's action.

87.    Plaintiff seeks to recover from Defendant $49,400 it paid to Michigan Asphalt, Inc. for replacing the parking lot, including excavation, laying additional base material, and installing new asphalt (Exhibits 16, 113). Plaintiff admitted that the parking lot was not new when Defendant first occupied the Premises in November 2002, but is seeking to hold Defendant responsible for the costs of installing a brand new (and rebuilt) parking lot. The parking lot was replaced by Michigan Asphalt, Inc. on or about September 30, 2016 – a year and two (2) months after Defendant vacated the Premises. While the parking lot sat vacant during this time, Plaintiff allowed snow and ice to accumulate on the parking lot, which caused further damage to the parking lot. The parking lot was gated after Defendant vacated and no one had access to the parking lot, including snow plows.

88.    Plaintiff seeks to recover from Defendant $950 it paid to Shelby Center Management, Inc. ("Shelby") for work that Shelby did on or about August 15, 2016 – more than a year after Defendant vacated the Premises (Exhibits 18, 113). A portion of what Plaintiff is seeking to recover is $560 for the removal of "scrub" trees and weeds which Plaintiff acknowledged grew after Defendant vacated the Premises (Exhibit 18).

89.    Plaintiff seeks to recover from Defendant $1,206 it paid to Augies Janitorial Services, LLC ("Augies") for work that Augies performed on or about October 26 and 27, 2016 – more than a year and three (3) months after Defendant vacated the Premises (Exhibits 18, 113). Augies provided "supplies" to Plaintiff and charged a total of $200 for the supplies (Exhibit 18, p.1). Plaintiff did not know what supplies Augies provided, other than sweeping compound, which was a separate charge of $106 (Exhibit 18, p. 2). The janitorial services that Augies provided were sweeping the shop floor and removing debris (Exhibits 18, 113). The debris was left by contractors that Plaintiff hired after Defendant vacated the Premises. The debris that allegedly was removed was not left by Defendant.

90.    Plaintiff seeks to recover from Defendant $1,100 of the $1,700 it paid to Adams Group for work that Adams Group performed on or about August 10, 2016 – more than a year after Defendant vacated the Premises (Exhibits 19, 113). Adams Group performed demolition services and demolished shelving and fixtures in the warehouse bathroom along with the partitions in the warehouse bathroom. The invoice from Adams Group expressly references that the project is "Building Improvements for Superior Cam, 31201 Mally Drive, Madison Heights." The

fixtures and the partitions in the warehouse bathroom were not new when Defendant occupied the Premises in November, 2002. Plaintiff asserts that the removal of the shelves was required by the building code and/or fire code. These changes are not Defendant's responsibility. To that end, during the Fed.R.Civ.P. 30(b)(6) deposition of Plaintiff, Mr. Mally testified that Plaintiff was not seeking to recover from Defendant the costs associated with the work performed by Adams Group.

91. Plaintiff seeks to recover from Defendant $6,800 it paid to Teera Construction Co. ("Teera") for services that Teera performed on or about August 17, 2016 – more than a year after Defendant vacated the Premises (Exhibits 20, 113). Specifically, Plaintiff seeks to recover $4,000 for installing two new doors with hardware and door frames (Exhibit 20). Notably, the doors were not damaged when Defendant vacated the Premises, only the hardware was damaged and only the replacement of the hardware was recommended (Exhibit 9, pp. 3-4). Plaintiff also seeks to recover $400 for "office fire wall."

92. Plaintiff seeks to recover from Defendant $800 of the $1300 it paid to Danco Contracting, Inc. ("Danco") for services that Danco performed on or about November 28, 2016 – more than a year and four (4) months after Defendant vacated the Premises (Exhibits 21, 113). The invoice from Danco is issued to Superior Cam, Inc., the new tenant at the Premises. The $800 sought by Plaintiff was for the installation of restroom accessories in the warehouse bathroom, installation of a closer at the office door, and the demolition of another shelf (Exhibit 21). Mr. Mally testified that the bathroom accessories were missing after Defendant vacated the Premises; however Garbo testified that the bathroom accessories were removed during the demolition of the bathroom by other contractors. The bathroom accessories were not new when Defendant first occupied the Premises in November, 2002 and were likely the original fixtures that were placed in the building in the 1960s. Defendant did not know who installed the shelf that was removed by Danco. Therefore, Defendant is not responsible for these costs.

93. Plaintiff seeks to recover from Defendant $1,199 it paid to Rayhaven Group ("Rayhaven") for bathroom partitions (Exhibits 22, 113). The partitions were ordered by Plaintiff on or about November 25, 2016 – more than a year and four months after Defendant vacated the Premises. The bathroom partitions were not new when Defendant took possession of the Premises in November, 2002. Plaintiff admitted that the bath partitions were needed to comply with the building

code and were removed during the renovation. Defendant is not responsible for these costs.

94.     Plaintiff seeks to recover from Defendant a total of $15,320 for repairs that Terex Services performed on the Cranes on or about August 21, 2016 – more than a year after Defendant vacated the Premises (Exhibits 23, 113). The Terex invoices only separate labor and parts. There is no way to determine, for example, how much it cost Plaintiff to repair and/or replace the pendant. Furthermore, under the express terms of the Lease, Plaintiff was responsible for all "major repairs" of the Cranes unless such repairs were due to the misuse of the Cranes by Defendant. Plaintiff has no evidence that Defendant ever misused the Cranes. Accordingly, Defendant is not responsible for these costs.

95.     Plaintiff seeks to recover from Defendant $2,710 of the $13,310 that Plaintiff paid to Endurance Painting for painting services that Endurance Painting provided on or about November, 2016 (Exhibits 24, 113). The Invoice from Endurance Painting is issued to Superior Cam. Notwithstanding that, Plaintiff seeks to recover $500 for painting shop doors. Plaintiff also seeks to recover $1,610 of the $2,510 Plaintiff paid Endurance Painting for "paint[ing] the interior office area and misc. shop offices and doors." However, Plaintiff had no idea how the allocation was made or how it was determined that Defendant should reimburse Plaintiff $1,610 for that service. Finally, Plaintiff seeks to recover $600 from Defendant for the epoxy of the warehouse bathroom floor even though the warehouse bathroom floor was not newly epoxied or painted when Defendant first occupied the Premises in November, 2002 and would otherwise qualify as normal wear and tear. It is not Defendant's responsibility to paint the Premises after its tenancy ends. To that end, during the Fed.R.Civ.P. 30(b)(6) deposition of Plaintiff, Mr. Mally testified that Plaintiff was not seeking to recover from Defendant the costs associated with the work performed by Endurance Painting. These costs clearly are not the responsibility of Defendant.

96.     Plaintiff admitted that the repairs made could have be done immediately after Defendant vacated the Premises, but Plaintiff chose not to do so.

97.     Defendant is entitled to a tax credit totaling $2,432.29 for real estate taxes paid by Defendant that were not otherwise due or owing.

## C.  PROPOSED CONCLUSIONS OF LAW

1.      In this diversity action, the court applies the substantive law of the forum state, Michigan. *See Himmel v. Ford Motor Co.,* 342 F.3d 593, 598 (6th Cir.2003) ("Because we are sitting in diversity, *see* 28 U.S.C. § 1332, we apply the law, including the choice of law rules, of the forum state." (footnote omitted) (citing *Hayes v. Equitable Energy Res. Co.,* 266 F.3d 560, 566 (6th Cir.2001)).

2.      "The primary goal in interpreting contracts is to determine and enforce the parties' intent." *Old Kent Bank v. Sobczak,* 243 Mich.App. 57, 620 N.W.2d 663, 666–67 (2000) (citing *Rasheed v. Chrysler Corp.,* 445 Mich. 109, 517 N.W.2d 19, 29 n. 28 (1994)). "In ascertaining the meaning of a contract, [the court] give[s] the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument." *Rory v. Cont'l Ins. Co.,* 473 Mich. 457, 703 N.W.2d 23, 28 (2005) (citing *Wilkie v. Auto–Owners Ins. Co.,* 469 Mich. 41, 664 N.W.2d 776, 780 (2003)).

3.      A contract must be "construed as a whole"; "[e]very word in the agreement must be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument." *Associated Truck Lines, Inc. v. Baer,* 346 Mich. 106, 77 N.W.2d 384, 386 (1956) (quoting *Laevin v. St. Vincent De Paul Soc'y,* 323 Mich. 607, 36 N.W.2d 163, 164 (1949)) (internal quotation marks omitted).

4.      Contract interpretation principles mandate that if a contract's language is clear, its construction is a question of law for a court. *Meagher v. Wayne State Univ.*, 222 Mich. App. 700, 721-722 (1997); *G&A Incorporated v. NAHRA*, 204 Mich. App. 329, 330 (1994).

5.      Courts will not depart from but, instead, will interpret contractual language based on its general prevailing meaning. *Amtower v. William Roney & Co.*, 232 Mich. App. 226, 234 (1999); *Dillon v. DeNooyer Chevrolet Geo*, 217 Mich. App. 163 (1996).

6.      Under Michigan law, commercial leases are construed against the landlord unless the tenant drafted the lease. *Cinderella Theatre Co. v. United Detroit Theatres Corp.*, 367 Mich. 424 (1962); *Carl A. Schuberg, Inc. v. Kroger Co.*, 113 Mich. App. 310 (1982). This rule is different from the contract law drafting presumption, which requires a contract to be construed against the drafter.

7.     Defendant's obligations under the terms of the Lease did not require Defendant to return the Premises to Plaintiff in a new condition. Paragraph 13 of the Lease merely required Defendant return the Premises in a "good" condition.

8.     Once the Lease was terminated and Defendant vacated the Premises, Defendant's obligation to maintain the Premises ceased.

9.     "A party claiming a breach of contract must establish by a preponderance of the evidence (1) that there was a contract, (2) that the other party breached the contract and, (3) that the party asserting breach of contract suffered damages as a result of the breach." *Thill v. Ocwen Loan Servicing, LLC*, 8 F. Supp. 3d 950, 954-955 (2014) (citing *Miller–Davis Co. v. Ahrens Const., Inc.,* 296 Mich.App. 56, 71 (2012)).

10.    The burden is upon the plaintiff to prove damages. *Benfield v. H.K. Porter Co.,* 1 Mich.App. 543 (1965). All breach of contract damages must be proven with a reasonable degree of certainty. *Lorenz Supply Co. v. American Standard, Inc.,* 100 Mich.App. 600, 611 (1980), *aff'd,* 419 Mich. 610 (1984). When plaintiff's proof of damages is based upon conjecture and speculation, and is unsupported by a reasonable factual basis of record, no recovery may be had. *Lawton v. Gorman Furniture Corp.,* 90 Mich.App. 258 (1979); *The Vogue v. Shopping Centers, Inc.,* 402 Mich. 546 (1978).

11.    "Under the rule of [Hadley v. Baxendale, 9 Exch 341; 156 Eng Rep 145 (1854)], the damages recoverable for breach of contract are those that arise naturally from the breach or those that were in the contemplation of the parties at the time the contract was made." *Kewin v. Massachusetts Mutual Life Ins. Co.*, 409 Mich. 401, 414–415 (1980). The Michigan Supreme Court incorporated this rule into the lease context in the early 20th century in *Wolf v. Megantz,* 184 Mich. 452 (1915).

12.    Essentially there are two types of damages available: those general damages that naturally arise from the breach and whatever special damages may have been actually within the contemplation of the parties at the time they entered into the contract: "(1) [W]here there are no special circumstances to distinguish the contract involved from the great mass of contracts of the same kind, the damages recoverable are such as would naturally and generally result from the breach according to the usual course of things, and (2) where there are special circumstances in the contract, damages which result in consequence of those

special circumstances are recoverable if, and only if, those special circumstances were communicated to or known by both parties to the contract at the time they entered into the contract. The second rule as above stated is sufficient to cover all cases of breach of contract, for it must be presumed that the parties would have contemplated that the party injured by the breach of the contract would sustain such damages as would fairly and substantially, in the usual course of things, result from such breach." *McNeal v Tuori,* 107 Mich. App. 141, 149 (1981) (citing Am.Jur. 2d Damages).

13.     Where one person has committed a tort, breach of contract, or other legal wrong against another, it is incumbent upon the latter to use such means as are reasonable under the circumstances to avoid or minimize the damages. The person wronged cannot recover for any item of damage which could thus have been avoided. *Shiffer v. Board of Educ.*, 393 Mich. 190, 197 (1974) (quoting McCormick, *Damages* §33 at 127); *Morris v. Clawson Tank Co.*, 459 Mich. 256, 263 (1998).

14.     While the plaintiff has the duty to mitigate damages, it is the defendant who has the burden of proving the plaintiff's failure to mitigate. *Ambassador Steel Co. v. Ewald Steel Co.*, 33 Mich. App. 495 (1971); *see also Reinardy v. Bruzzese*, 368 Mich. 688 (1962); *Froling v. Bischoff*, 73 Mich. App. 496 (1977); *Hines v. Grand Trunk W RR*, 151 Mich. App. 585 (1985); *Lawrence v. Will Darrah & Assocs.*, 445 Mich. 1 (1994).

15.     Defendant proved that Plaintiff failed to mitigate its damages by waiting more than a year after Defendant vacated the Premises to make any repairs.  Plaintiff admitted that it could have made the repairs immediately after Defendant vacated the Premises, but it chose not to do so.

16.     The damages which Plaintiff seeks to recover were not the type of damages that were contemplated by the parties when entering into the Lease and are not damages that generally and naturally flow from the terms of the Lease.

17.     Under the terms of the Lease, Defendant is not obligated to provide Plaintiff with a new parking lot upon vacating the Premises.

18.     Plaintiff has failed to prove his damages with a reasonable degree of certainty.  Plaintiff failed to articulate how costs of the repairs were allocated to

Defendant and did not meet its burden of proof with respect to its purported damages.

19.     Plaintiff failed to establish by a preponderance of the evidence that under the terms of the Lease it is entitled to recover $14,525 from Defendant for the work performed by Kellett (Exhibits 12, 113). Further, with respect to Invoice 47452, Plaintiff did not prove with any reasonable degree of certainty what work Kellett performed to justify the $9,065 amount reflected on Invoice 47452 (Exhibits 12, 113). Plaintiff did not prove with any reasonable degree of certainty how Plaintiff made the allocation of $9,065 (from the total $9,970 reflected in Invoice 47452) as damages Plaintiff is entitled recover from Defendant. Moreover, with respect to Invoice No. 47365, Plaintiff did not prove with any reasonable degree of certainty how Plaintiff made the allocation of $1,060 (from the total $1,735 reflected in Invoice 47365) as damages Plaintiff is entitled to recover from Defendant. Accordingly, Plaintiff failed to meet its burden of proof as to liability or damages and is not entitled to recover the $14,525 it sought to recover from Defendant.

20.     Plaintiff did not establish by a preponderance of the evidence that under the terms of the Lease it is entitled to recover $335 from Defendant for the work performed by Mechanical Heating & Cooling (Exhibits 13, 113). More specifically, Plaintiff did not establish by a preponderance of the evidence that Defendant breached its obligation under the Lease to maintain the HVAC system. Plaintiff failed to establish by a preponderance of the evidence that Defendant was the cause of the normal, routine maintenance that Mechanical Heating & Cooling performed more than a year after Defendant vacated the Premises. Accordingly, Plaintiff failed to meet its burden of proof and is not entitled to recover the $335 it sought to recover from Defendant.

21.     Plaintiff did not establish by a preponderance of the evidence that under the terms of the Lease it is entitled to recover $13,621.45 from Defendant for the work performed by CNS (Exhibits 14, 113). First, Plaintiff did not establish by a preponderance of the evidence that Defendant was the reason the repairs were needed. The work performed by CNS was required to comply with the building code. Furthermore, Defendant did not prove with any reasonable degree of certainty how Plaintiff made the allocation of $12,291.45 (from the total $24,281.45 reflected in Invoice 4213) as damages Plaintiff is entitled to recover from Defendant. Further, Plaintiff was unable to prove with any reasonable degree of certainty exactly what work was performed by CNS for which Plaintiff now sought to hold Defendant accountable. Accordingly, Plaintiff did not meet its

burden of proof and is not entitled to recover the $13,621.45 it sought to recover from Defendant.

22.     Plaintiff did not establish by the preponderance of the evidence that under the terms of the Lease it is entitled to recover $6,000 from Defendant for the work performed by Shelby Underground (Exhibits 15, 113).  First, Plaintiff did not establish by a preponderance of the evidence that Defendant was the reason the repairs were needed.   Specifically, Plaintiff did not prove that the purported damage that necessitated the repairs to the catch basins and leads to the main pipes were not caused by a prior tenant.   Plaintiff also did not establish by a preponderance of the evidence that Defendant's failure to make the repairs to the catch basin and main pipes was a breach of the Lease.  Accordingly, Plaintiff did not meet its burden of proof and is not entitled to recover the $6,000 it sought to recover from Defendant.

23.     Plaintiff did not establish by a preponderance of the evidence that under the terms of the Lease it is entitled to recover $49,400 from Defendant for the work performed by Michigan Asphalt (Exhibits 16, 113).  First, Plaintiff did not establish by a preponderance of the evidence that under the terms of the Lease Defendant is responsible for providing Plaintiff with a new parking lot, when Defendant did not receive a new parking lot when it first occupied the Premises in November, 2002 and that Defendant's failure to provide a new parking lot was a breach of the Lease.  Further, Plaintiff did not establish by a preponderance of the evidence that Defendant caused the damage that necessitated the repairs to the parking lot.  Defendant conceded, however, that it was responsible for $10,000 of repairs to the parking lot because it was in slightly worse condition than when it received it.  Accordingly, Plaintiff did not meet its burden of proof to recover the full $49,400 from Defendant, but due to Defendant's concession, Plaintiff is entitled to recover $10,000 from Defendant for repairs to the parking lot.

24.     Plaintiff did not establish by a preponderance of the evidence that under the terms of the Lease it is entitled to recover $950 from Defendant for work performed by Shelby Care Management (Exhibits 17, 113).  First, Plaintiff did not establish by a preponderance of the evidence that Defendant was responsible for pulling weeds and removing scrub trees from the Premises more than a year after Defendant vacated the Premises and that its failure to do so was a breach of the Lease.  Plaintiff also failed to prove with any reasonable degree of certainty that Defendant's action caused the need for crushed asphalt to be graded by Shelby Care Management.  Accordingly, Plaintiff did not meet its burden of proof and is not entitled to recover the $950 it sought to recover from Defendant.

25.     Plaintiff did not establish by a preponderance of evidence that under the terms of the Lease it is entitled to recover $1,206 from Defendant for work performed by Augies for Janitorial Services (Exhibits 18, 113).  First, Plaintiff did not prove with any reasonable degree of certainty that Plaintiff is responsible for the purchase of supplies more than a year after it vacated the Premises or for cleaning the Premises more than a year after it vacated the Premises.  Furthermore, Plaintiff admitted that the cleaning that Augie's performed was to clean up the mess left by contractors that Plaintiff hired to do work at the Premises, not by Defendant.  Accordingly, Plaintiff did not meet its burden of proof and is not entitled to recover $1,206 it sought to recover from Defendant.

26.     Plaintiff did not establish by a preponderance of the evidence that under the terms of the Lease it is entitled to recover $1,100 from Defendant for work performed by Adams Group from Defendant (Exhibits 19, 113).  First, Plaintiff failed to prove that Defendant caused the need for the repairs.  Further, Plaintiff admitted that the work by Adams Group was done in order to comply with building and/or fire codes. Accordingly, Plaintiff did not meet its burden of proof and is not entitled to recover $1,100 from Defendant.

27.     Plaintiff did not establish by a preponderance of the evidence that under the terms of the Lease it is entitled to recover $6,800 from Defendant for work performed by Teera (Exhibits 20, 113).  More specifically, with the exception of repairing the shop block walls (at a cost of $1,600), Plaintiff did not establish by a preponderance of the evidence that, under the terms of the Lease, Defendant is responsible for installing new doors, demolishing bathrooms or performing any work to an "office fire wall" or that Defendant's failure to do so is a breach of the Lease.  Accordingly, Plaintiff did not meet its burden of proof and is not entitled to recover $5,200 of the $6,800 it seeks to recover from Defendant.

28.     Plaintiff did not establish by a preponderance of the evidence that under the terms of the Lease it is entitled to recover $800 from Defendant for work performed by Danco (Exhibits 21, 113).  More specifically, Plaintiff did not prove that Defendant was responsible under the Lease for supplying fire extinguishers, replacing ceiling tiles, installing closers, restroom soap, removing handicap signs and installing new ones, hanging new doors and hardware for the doors, installing new restroom accessories, or demolishing shelves (Exhibit 21) or that Defendant's failure to do so was a breach of the Lease.  In fact, Plaintiff admitted that these items were necessary only because Plaintiff removed them during renovations (as opposed to any affirmative act of Defendant's).  Accordingly, Plaintiff did not

meet its burden of proof and is not entitled to recover $800 it seeks to recover from Defendant.

29.     Plaintiff did not establish by a preponderance of the evidence that under the terms of the Lease it is entitled to recover $1,199 from Defendant for the work and/or goods provided by Rayhaven (Exhibits 22, 113).  More specifically, Plaintiff did not prove that Plaintiff was responsible for providing new bathroom partitions and toilets seats (Exhibit 113, p. 2) under the terms of the Lease or that Defendant's failure to do so was a breach of the Lease.  In fact, Plaintiff admitted that the partitions were needed as a result of the remodeling that Plaintiff did to the warehouse bathroom and because the partitions were "old" – not based on any act or failure to act by Defendant.  Accordingly, Plaintiff did not meet its burden of proof and is not entitled to recover $1,199 it seeks to recover from Defendant.

30.     Plaintiff did not establish by a preponderance of the evidence that under the terms of the Lease it is entitled to recover $15,320 from Defendant for services performed by Terex on the Cranes (Exhibits 23, 113).  More specifically, Plaintiff did not establish by a preponderance of the evidence that the repairs were *not* major repairs under Paragraph 54 of the Lease or that Defendant's misuse of the Cranes caused the purported damage (Exhibit 1).  Accordingly, Plaintiff did not meet its burden of proof and is not entitled to recover $15,320 it seeks to recover from Defendant.

31.     Plaintiff did not establish by a preponderance of the evidence that under the terms of the Lease it is entitled to recover $2,710 from Defendant for the painting services performed by Endurance Painting (Exhibits 24, 113).  More specifically, Plaintiff did not establish by a preponderance of the evidence that the painting that was performed by Endurance Painting was in order to get the Premises ready for the new tenant, Superior Cam and/or was the result of normal wear and tear.  Plaintiff also failed to prove with any reasonable degree of certainty how it allocated the portion of Endurance Painting's invoices to Defendant.  Accordingly, Plaintiff did not meet its burden of proof and it is not entitled to recover $2,710 from Defendant.

32.     Plaintiff did not establish by a preponderance of the evidence that under the terms of the Lease it is entitled to recover $7,266 for the consulting services provided to Plaintiff by National Construction Mgmt (Exhibits 25, 113).  In fact, there is not one single provision in the Lease which allows Plaintiff to recover such fees.  Furthermore, consulting fees are not the type of damages that

generally and naturally flow from the Lease. Accordingly, Plaintiff did not meet its burden of proof and it is not entitled to recover $7,266 from Defendant.

33. While Plaintiff is entitled to one month's rent from Defendant for July, 2015, in the amount of $8,816.67, Plaintiff is in possession of Defendant's security deposit in the amount of $8,816.67. Accordingly, the amounts offset each other and Plaintiff is not entitled to any additional monies for rent.

34. Based on the above, Plaintiff is only entitled to recover $9,167.71 from Defendant. The calculation is based on the concession that Defendant may owe $10,000 for parking lot repairs and $1,600 to repair the warehouse wall, less the $2,432.29 tax credit Plaintiff owes Defendant.

## D.    CONCLUSION

Universal Granite & Marble, Inc. respectfully requests that this Court enters an order finding that that Mallco Company is only entitled to damages in the amount of $9,167.71.

FRASCO CAPONIGRO
WINEMAN & SCHEIBLE, PLLC


*/s/ Tracey L. Porter*
Eric D. Scheible (P54174)
Tracey L. Porter (P69984)
Attorneys for Defendant
1301 W. Long Lake Road, Suite 250
Troy, MI  48098
(248) 334-6767 / (248) 334-0999 (fax)
es@frascap.com
tp@frascap.com

Dated: March 17, 2017

**<u>Proof of Service</u>**

I hereby certify that on March 17, 2017, I electronically filed Defendant's Proposed Findings of Fact and Conclusions of Law with the Clerk of the Court using the ECF Electronic Filing System, which will send notification of such filing to counsel of record.

<u>/s/ Margaret LeVon                    </u>